## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO (SAN JUAN)

_____

|  |  |  |
|---|---|---|
| **MANUEL GARCÍA-CORTÉS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:19-cv-1319-DJC** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

_____

### MEMORANDUM AND ORDER

**CASPER, J.**                                                      **September 29, 2020**

### I.    Introduction

Plaintiff Manuel García-Cortés ("García-Cortés") filed a claim for disability insurance benefits ("SSDI") with the Social Security Administration ("SSA") on June 25, 2013.  R. 189.[1] Pursuant to the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), García-Cortés brings this action for judicial review of the final decision of Andrew Saul, the Commissioner of the SSA ("the Commissioner"),[2] issued by an Administrative Law Judge ("ALJ") on January 13, 2017.  D. 1. García-Cortés has moved to reverse the ALJ's decision denying his SSDI benefits, D. 13, and the Commissioner has moved to affirm, D. 16.  For the reasons discussed below, the Court DENIES García-Cortés' motion to reverse and ALLOWS the Commissioner's motion to affirm.

_____

[1] "R." refers to citations to the Administrative Record, filed at D. 8-1.

[2] The current Commissioner of the SSA, Andrew Saul is substituted here.  See Fed. R. Civ. P. 25(d).

## II.     Factual Background

García-Cortés ceased working as a food service assistant in April 2010.  R. 186, 307.  On June 25, 2013, García-Cortés applied for disability benefits alleging disability due to post-traumatic stress disorder ("PTSD"), severe depression, a metal rod in his right leg and metal plates in his head due to a car accident, trauma, injuries and pain to entire body.  R. 172, 306.

## III.     Procedural Background

García-Cortés filed a claim for SSDI on June 25, 2013.  R. 189.  The SSA denied García-Cortés' application in its initial review on December 6, 2013, R. 74, and upon reconsideration on July 31, 2014.  R. 78.  On August 15, 2014, García-Cortés filed a timely request for a hearing before an ALJ.  R. 216.  The ALJ held a hearing on December 13, 2016.  R. 237.  On January 13, 2017, the ALJ determined that García-Cortés did not have a disability within the meaning of the Social Security Act and denied his claims.  R. 27-40.  The Appeals Council denied García-Cortés' request for review on February 6, 2019, making the ALJ's decision the final decision of the Commissioner.  R. 1.  García-Cortés has now initiated this action seeking judicial review of that denial.  D. 1.

## IV.     Legal Standards

### A.     <u>Standard of Review</u>

This Court may affirm, modify, or reverse a decision of the Commissioner.  <u>See</u> 42 U.S.C. § 405(g).  Such judicial review, however, "is limited to determining whether [the Commissioner] deployed the proper legal standards and found facts upon the proper quantum of evidence." <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999) (citing <u>Manso-Pizarro v. Sec'y of Health & Human Servs.</u>, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).  The ALJ's findings of fact are conclusive and must be upheld by the reviewing court when supported by substantial evidence

"even if the record arguably could justify a different conclusion." Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodríguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted).

Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotations and citations omitted), and exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Such findings are conclusive when supported by substantial evidence "but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." See Nguyen, 172 F.3d at 35 (internal citations omitted). Thus, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

## B.   Entitlement to Disability Benefits

A claimant's entitlement to SSDI turns in part on whether he has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do his past relevant work or any other substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process to determine whether an individual is disabled for Social Security purposes. 20 C.F.R. § 404.1520(a)(1). The determination may be

concluded at any step along the process.  20 C.F.R. § 404.1520(a)(4).  First, if the applicant is engaged in substantial gainful work, then the application is denied.  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the applicant does not have, or has not had within the relevant period, a severe impairment or combination of impairments, then the application is denied.  20 C.F.R. § 404.1520(a)(4)(ii).  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted.  20 C.F.R. § 404.1520(a)(4)(iii).  Fourth, if the applicant's residual functional capacity ("RFC") is such that he can still perform past relevant work, then the application is denied.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth and finally, if the applicant, given his RFC, education, work experience and age is unable to do any other work, the application is granted.  20 C.F.R. § 404.1520(a)(4)(v).

## V.     Before the ALJ

### A.     Medical History

#### a)     Physical Impairments

García-Cortés was in an automobile accident on August 10, 1997.  R. 111.  As a result, he suffered a fractured face, legs, had "rod and nails installed," R. 148, and had an implantation of a "Silicone Prosthesis Floor of the Left Orbital."  R. 111.  García-Cortés underwent plastic surgery to reestablish "functioning in the anatomical area affected" and to "correct the facial or hand disfiguration."  R. 111.

García-Cortés was involved in another car accident in 2001.  R. 148. Following these accidents, García-Cortés suffered from nightmares, intrusive memories, felt tired, was forgetful and was unable to think, concentrate or pay attention.  Id.  García-Cortés described himself as constantly and easily irritable and he now avoids places with people.  Id.

About six years later, García-Cortés underwent a physical therapy evaluation.  R. 135.
According to the evaluation, García-Cortés had a reduction of pain, reduced sensorial disorder in
his foot, a diminution of inflammation in his foot, increased muscle strength in right knee and had
less difficulty performing daily activities.  R. 135-136.  At the time of the evaluation, García-
Cortés was working as an assistant at the Family Department and carried heavy boxes.  R. 138.
He still had pain in his legs when running, going up and down stairs and while playing basketball.
R. 138-139.

In October 2007, García-Cortés underwent a reevaluation where he reported occasional
pain in his right knee and right ankle.  R. 133.  According to the reevaluation report, García-Cortés
did not "present movement on foot," had "minimal muscular atrophy," "muscle spasms," and
"muscle shortening of the right hamstring."  Id.  The report recommended reevaluation with a
doctor and "to continue extensions . . . by the therapist."  Id.

In March 2010, Dr. Myrna L. Díaz Collazo noted in an imaging report that she observed
"[i]ntramedullary rod of the right femur," "[a]rthritic changes of the right knee," and "mild
irregularity of the proximal tibia [ ], which most likely correlate[d] with previous trauma" in
García-Cortés' right knee and lateral.  R. 398.  Dr. Díaz Collazo also observed "evidence of
previous mid femoral shaft structure," and "[p]osterior and early plantar calcaneal spur formation."
Id.  Dr. Díaz Collazo observed that the "rest of [García-Cortés'] visualized bony structures were
normal," he had "[n]o lytic or blastic bone lesions," and there was "[n]o evidence of acute bone
injury."  Id.

In October 2013, García-Cortés met with consulting internist, Dr. Eleuterio Loperena
Jimenez.  R. 415.  García-Cortés reported that he suffered from pain in his leg, hips and "all body
pain," frequent ear infections and marked insomnia.  R. 416.  Dr. Loperena Jimenez did not observe

any disabilities of his functional capacities.  R. 419.   During the visit, García-Cortés had normal sitting, standing, walking, and carrying and the doctor noted that he needed "no help . . . to move around the office, to go in or out of the exam. table nor to change . . . clothes."  R. 418-419. García-Cortés had no joint, arm or leg abnormalities and had no swelling, inflammation, redness or pain in his arms, legs or back.  R. 419.  He also had normal muscular strength, posture, and march.  Id.  Dr. Loperena Jimenez noted that García-Cortés' medication included Wellbutrin, Celexa, Bodoger, Estalozan and Seroquel.  R. 416.

About a month later, García-Cortés met with psychiatrist, Dr. Armando I. Caro.  R. 426. Regarding his physical health, Dr. Caro noted that García-Cortés reported having chronic back and body pain, that his medical history included multiple body trauma related to the 1997 car accident and that García-Cortés had "multiple orthopedic and maxillofacial surgeries."  Id.  Dr. Caro noted that García-Cortés is independent in some of his activities of daily living but that he needs assistance with "lifting objects, walking long distances, preparing meals, [and] cleaning the house."  Id.  Dr. Caro observed that García-Cortés walked with a limp unassisted and his physical diagnostic impression as to his physical condition included a "pain disorder associated to general medical condition" and "s/p multiple body trauma."  R. 427.

In or about November 2013, there were state agency assessments of García-Cortés' physical limitations. R. 172-188.  Dr. Nelson Colon reviewed García-Cortés' medical records and determined that his physical limitations were not severe.  R. 180.  Dr. Nelson Colon assessed García-Cortés' allegations of functional limitations as "not credible" given the documentation that García-Cortés played basketball, ran, and lifted heavy weights as far [back] as 2010 and the fact that he had "no determinable significant musculoskeletal impairments."  Id.

In April 2016, García-Cortés met with Dr. Jamil T. Díaz Ruíz for a routine medical visit. R. 443-446.  During that visit, he described his pain as a three out of ten.  R. 446.  Dr. Díaz Ruíz noted that García-Cortés' general appearance was normal, and that examinations of his back, lower extremities, gastrointestinal, skin, and musculoskeletal were also normal.  R. 445.  Dr. Díaz Ruíz also noted that García-Cortés was independent in taking care of his personal hygiene and was capable of planning and cooking full meals.  R. 444.  Dr. Díaz Ruíz assessed García-Cortés with "N202 Calculus of the kidney with calculus of ureter, K4030 Unilateral inguinal hernia, with obstruction, without gangrene" and offered him counseling for nutrition and physical activity.  R. 446.  Dr. Díaz Ruíz instructed García-Cortés to return as necessary.  Id.

Two months later, García-Cortés returned to Dr. Díaz Ruíz for another routine visit and complained of low back pain.  R. 441.  Dr. Díaz Ruíz described García-Cortés' appearance and physical examinations as normal.  Id.  Dr. Díaz Ruíz assessed García-Cortés with mixed hyperlipidemia and lumbago with sciatica on an unspecified side.  R. 442.  Dr. Díaz Ruíz noted that García-Cortés' active medications were Relafen and Zocor.  R. 442.  Dr. Díaz Ruíz did not give any orders or referrals, but he did offer counseling for nutrition and physical activity and again instructed García-Cortés to return as necessary.  Id.

State agency medical consultant Dr. Vicente Sanchez reviewed García-Cortés' record in July 2014.  195-196.  Dr. Sanchez affirmed Dr. Colon's initial assessment because there was "no additional evidence that could support significant worsening of the conditions."  R. 196.

b)    *Mental Impairments*

García-Cortés began treatment with psychiatrist Dr. Alberto Rodríguez Robles in August 2012. R. 168.  García-Cortés' principal complaint was that he did not sleep well, had anxiety, and felt sad and down.  Id.  García-Cortés stated that he had previously seen a psychiatrist after he was

fired, that he become depressed, was forgetful and that his face has "changed" since the accident. Id.

Dr. Rodríguez Robles completed a mental impairment assessment in June 2013 about García-Cortés.  R. 401-411; R. 148-149.  García-Cortés reported that since 2010 he has felt depressed, insecure, and anxious most days of the week.  R. 148.  He also reported experiencing headaches, forgetfulness, difficulty concentrating, irritability and recurring nightmares related to his car accidents.  Id.  Dr. Rodríguez Robles described García-Cortés as "apprehensive, depressed with psychomotor retardation," with restricted affect and "ideations of worthlessness, hopelessness ad abandonment."  Id.  The doctor noted that García-Cortés' intellectual capacity was average, capacity for attention and concentration were diminished, and his memory capacity and introspection were poor.  R. 148-149.  He noted that García-Cortés "is orientated in the three spheres" and "his judgment is superficial."  R. 149.

 Dr. Rodríguez Robles concluded that García-Cortés could not meet competitive standards in any of the mental abilities and aptitudes needed to do unskilled, semiskilled, or skilled work. R. 408-409.  He noted that  García-Cortés had difficulty understanding and remembering very short and simple instructions, could not complete a normal workday and workweek without interruptions from psychologically based symptoms, deal with stress of semiskilled and skilled work, travel in unfamiliar places, or use public transportation.  Id.  Dr. Rodríguez Robles further found that García-Cortés had marked functional limitations in his daily living, social functioning, maintaining concertation, persistence or pace, and that García-Cortés experienced three episodes of decompensation within twelve-month period, each of at least two weeks duration.  R. 410.  Dr. Rodríguez Robles anticipated that García-Cortés would be absent from work on average more than four days per month and that his impairments were expected to last at least twelve months.  R. 411.

Dr. Rodríguez Robles diagnosed García-Cortés with PTSD and severe major depression with psychosis.  R. 404 (noting DSM diagnosis of 296.24 and 309.81).  At this time, García-Cortés' medications included Restoril, Celexa, Seroquel and Wellbutrin XL.  R. 404.

In July 2013, García-Cortés replaced Restoril with D/C Restoril and began taking Prosom (a sedative used to treat insomnia) and Vistaril.  R. 424.  In September 2013, García-Cortés discontinued Restoril.  See R. 423.  About two months later, García-Cortés began taking Voltaren XR.  R. 422.

García-Cortés met with Dr. Rodríguez Robles again in November 2013.  R. 165.  García-Cortés reported that he still felt nervous, easily fearful, experienced face and back pain, continued to experience nightmares, felt depressed and was forgetful.  Id.  García-Cortés' affect was depressed, anxious and restricted.  Id.  Dr. Rodríguez Robles noted that García-Cortés tolerated his medications well.  Id.

A few day later, García-Cortés met with Dr. Caro.  García-Cortés attributed his depression to the "worsening of his physical condition."  R. 426.  Dr. Caro noted that García-Cortés has been on psychiatric treatment for the past two years, that García-Cortés was prescribed Bupropion XL, Citalopram, Quetiapine, Estazolam and Hydroxyzine.  Id. These medications improved García-Cortés' sleep and decreased his anxiety.  Id.  According to Dr. Caro, García-Cortés has never been admitted to a psychiatric hospital, never attempted suicide, and does not use alcohol, illicit drugs, coffee, or tobacco.  Id.  During the mental status examination, García-Cortés was well groomed, calm, cooperative, had good eye contact, short attention span and moderate psychomotor retardation.  R. 427.  His speech was fluent, coherent, and logical.  Id.  García-Cortés had "no flight of ideas or looseness of associations," no suicidal or homicidal ideations, no auditory or visual hallucinations, no delusions, and he was oriented in time, place, and person.  Id.  His mood

was depressed and affect constricted, concertation was impaired, he was not able so subtract seven from a hundred five times, nor was he able to spell the word "*mundo*" backwards, his short term memory was impaired but his recent and remote memory were preserved. Id. Dr. Caro also noted that García-Cortés' abstract thinking was preserved, and his judgment and insight were fair. Id. García-Cortés scored a 23 out of 30 on his Folsten Mini Mental Status Examination.[3] Regarding his mental health, Dr. Caro diagnosed García-Cortés with moderate major depressive disorder and a GAF of 50-55.[4] Id.

In December 2013, state agency psychologist, Dr. Luis Umpierre, assessed García-Cortés' mental limitations. R. 179. Dr. Umpierre concluded that "the bulk of findings" in his medical record describes a moderate mental disorder that still allows García-Cortés to learn, understand, remember and execute simple instructions. Id. Dr. Umpierre stated that García-Cortés could sustain pace and attention and persist at work activities during a regular workday or workweek without special help or supervision, adjust to changes in work routes and environments and interact with public, coworkers and supervisors. Id. Dr. Umpierre concluded that García-Cortés had depressive syndrome with moderate restrictions in daily living, social functioning, maintaining concertation, persistence or pace and no episodes of decompensation. R. 181.

Progress reports by Dr. Rodríguez Robles from February and April 2014 note that García-Cortés continued to suffer from nightmares due to the 1997 and 2001 car accidents, that he lacked an appetite, experienced difficulty sleeping at night, sleeps during the day, was irritable, depressed

---

[3] The Commissioner notes that this is "indicative of no more than a mild cognitive impairment." D. 16 at 5 & n. 2 (citing Eur J Ageing, Using the Folstein Mini Mental State Exam (MMSE) to Explore Methodological Issues in Cognitive Aging Research, U.S. National Library of Medicine, National Institute of Health, Sep. 9, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5547414/).

[4] García-Cortés states that a GAF of 50 is severe and 55 is moderate. D. 13 at 5.

and anxious.   R. 163-164.   Dr. Rodríguez Robles, however, also noted that García-Cortés continued to tolerate his medication well.   Id.

State agency psychologist, Dr. Jesús Soto reviewed the medical record in July 2014 and affirmed Dr. Umpierre's assessment because the evidence in the record did not reveal "a worsening of [García-Cortés'] mental condition."   R. 196.   García-Cortés continued meeting with Dr. Rodríguez Robles until at least October 2016.   R. 171.   Dr. Rodríguez Robles noted that García-Cortés was still irritable, easily angered, and that he experienced "lows and highs but becomes depressed often."   Id.

**B.**    **ALJ Hearing**

The ALJ heard testimony from García-Cortés, a psychological expert Dr. Annette De Paz Ortiz and a vocational expert ("VE") Minerva Puig.   R. 47-73.

*a)*    *García-Cortés' Testimony*

At the time García-Cortés testified, he was forty-eight years old.   R. 50.   He explained that he had been involved in a car accident in 1997 and then another car accident in either 2001 or 2002.   R. 52.   According to García-Cortés, his accidents had a great impact on him, both physically and mentally.   R. 53.   After the accidents he had surgery on his nose and hip, his teeth were "tied" for several months and he became extremely thin.   R. 57.   He currently had two plates in each eye socket, titanium plates and rods with titanium and screws in his leg.   Id.   García-Cortés testified that the accidents and his divorce were emotionally draining.   R. 57.

García-Cortés worked as a food service assistant at an elderly center called the Family Department from 2002 until 2010 when he was laid off.   R. 51.   He did not seek further employment because of his depression.   R. 51-52; R. 67.   After he was laid off, García-Cortés stopped taking care of himself, his condition worsened, and he began having whole body aches.

R. 67.  He chose not to apply for SSI benefits at that time, however, because he "wanted to feel like a useful person for society" and did not "want to feel like a parasite."  R. 68.

Counsel for García-Cortés noted that he began treatment for his conditions in 2012 with Dr. Rodríguez Robles.  R. 48.  Dr. Rodríguez Robles diagnosed him with PTSD, depression and marked restrictions in daily activities, maintaining social functioning and maintaining concentration and pace.  R. 48-50.  Counsel also noted that Dr. Caro diagnosed García-Cortés with moderate major depression, pain disorder and multiple body trauma; and noted that he had impaired concertation and difficulty with short-term memory.  R. 50.  García-Cortés testified that in addition to his depression, he has difficulty falling asleep, he was in a lot of physical pain, lacked affectation, felt lonely and had many setbacks in his life.  R. 53.  He also testified that he has suffered from hallucinations and has heard voices telling him to kill himself.  R. 55.

García-Cortés' daily routine consisted of waking up, sitting down in his room, listening to the news, getting up to sit on a hammock in his patio, eating and laying down.  R. 56.  His mother did most of the cooking, but he could make himself cereal.  Id.  He was capable of driving but does not do this much since he rarely leaves the house.  R. 56-57.

b)    *Dr. De Paz Ortiz's Testimony*

Dr. De Paz Ortiz testified that García-Cortés' nightmares, irritability, and poor sleep were not necessarily characteristics of PTSD, that many of the characteristics of PTSD were not mentioned in the record and that Dr. Rodríguez Robles' diagnosis was not completely developed. R. 61-62.  Regarding García-Cortés' medication, Dr. De Paz Ortiz testified that there was no evidence in the record to suggest that García-Cortés had any side effects to the medication he was taking.  R. 64.  Dr. De Paz Ortiz acknowledged that there were changes in García-Cortés' medication throughout the years, but explained that the initial dosages were moderate and there

was no evidence in the record that these changes were due to a severe change in his condition. R. 64-65. Instead, Dr. De Paz Ortiz posited that the increases could be a result of the fact that García-Cortés tolerated the medication better. R. 65.

c)    *VE Testimony*

The VE testified about García-Cortés' past work as a food service assistant and kitchen helper. The VE described these positions as unskilled work requiring light physical exertion. R. 70. The ALJ then went on to pose a series of hypothetical questions to the VE. Id. The ALJ asked the VE if an individual, with García-Cortés' age, education, and work background, who could do only simple, repetitive, routine work with simple instructions, concentrate on simple tasks for two hours before taking a break, interact with coworkers and supervisors frequently and never interact with the public could perform any of his past work. Id. The VE responded that the individual could not perform García-Cortés' past work because it required contact with the public. R. 71. The ALJ then asked the VE if there were any other jobs that person could do with those limitations. Id. The VE stated that there were several jobs that someone with those limitations could do with objects, manufacture, or post-manufacture, like an inspector. Id. The ALJ then asked if this hypothetical individual could perform these same jobs if instead, he could only interact with coworkers and supervisors occasionally. Id. The VE said that he could not do those jobs nor any other job that can be performed in a national economy. R. 71-72.

In another hypothetical, the ALJ asked the VE whether a hypothetical individual with the aforementioned limitations, but who also needed to miss two days a month of work because of medication side effects, could work the jobs discussed or any other job. R. 72. The VE stated that such individual would not be able to work. Id. The ALJ then asked if that individual could do García-Cortés' prior work or any other job, if he could only do simple, repetitive, routine work

with simple instructions and concentrate for two hours before taking a break to work for another two hours.  R. 72-73.  The VE affirmed that the individual could not perform García-Cortés' past work or any other work.  R. 73.

### C.   Findings of the ALJ

Following the five-step process under 20 C.F.R. § 416.920, the ALJ found that at step one, García-Cortés had not engaged in substantial gainful activity since April 30, 2010.  R. 29.  At step two, the ALJ found that García-Cortés had one severe impairment, major depressive disorder. R. 29.  The ALJ noted that García-Cortés had other medically determinable impairments, including multiple body traumas related to two separate motor vehicle accidents and PTSD.  R. 30-31.  The ALJ concluded, however, that those impairments were not severe.  R. 30-31.

At step three, the ALJ found that García-Cortés did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 32.  The ALJ considered the "paragraph B" criteria and determined that García-Cortés had moderate restrictions in activities of daily living, R. 32-33, and moderate difficulties in social functioning, communication, and persistence or pace.  R. 33-34.  At step four, the ALJ found that García-Cortés was unable to perform any past relevant work, R. 37, but that he had the RFC to perform a full range of work at all exertional levels but with some non-exertional limitations.  R. 34-37.  The ALJ concluded that García-Cortés "could perform simple, routine and repetitive tasks," "concentrate for two-hour periods at simple tasks and [] complete a regular workday/workweek performing simple tasks," and "could frequently interact with coworkers and supervisors, but never with the public."  R. 34.  Fifth and finally, the ALJ concluded that given García-Cortés' RFC, education, work experience and age, "there were jobs that existed in significant numbers in the national economy" that he could perform.  R. 38-39.

Accordingly, the ALJ concluded that García-Cortés did not have a disability within the meaning of the Social Security Act.  R. 39.

## VI.    García-Cortés' Challenges to the ALJ's Findings

García-Cortés seeks reversal of the ALJ's decision or, alternatively, remand of the case for further proceedings.  D. 13.  García-Cortés contends that the ALJ failed to use the correct legal standard and that her findings were not supported by substantial evidence.  D. 1 ¶¶ 8-12; D. 13 at 6.  According to García-Cortés, the ALJ erred by (1) only considering his major depressive disorder and ignoring his other severe impairments; (2) finding that his mental impairments did not meet or equal medical listings 12.04 and 12.15; and (3) discounting the findings of his treating psychiatrist and consulted psychiatrist in determining his RFC.  D. 13 at 9-19.

### A.    The ALJ Did Not Ignore García-Cortés' Other Impairments

#### 1.    *Physical RFC Findings*

García-Cortés argues that the ALJ failed to consider important details when determining his physical RFC and the exertional and non-exertional factors.  D. 13 at 9.

First, contrary to García-Cortés' assertion, D. 13 at 9, the ALJ did consider his musculoskeletal ailments.  R. 30.  The ALJ concluded that García-Cortés did not "present with any evidence of musculoskeletal abnormality during a consultative evaluation on October 22, 2013."  Id; see R. 419.  The October 2013 evaluation also noted that García-Cortés had normal sitting, standing, walking, and carrying.  R. 418.  He had no joint, arm, or leg abnormalities; no swelling, inflammation, redness or pain in his arms, legs or back; and normal muscular strength, posture, and march.  R. 418- 419.

There is some evidence in the record—which the ALJ also considered—that in November 2013, García-Cortés walked with a limp, unassisted and that he self-reported needing "assistance

with some instrumental activities of daily living" such as "lifting objects, preparing meals and cleaning." R. 30; see R. 426-427. As the ALJ concluded, however, "there is no evidence of treatment for the alleged physical conditions at the time of the consultative evaluations or any other moment during the relevant period until this year." R. 30.

Second, García-Cortés argues that "[g]iven the evidence of pain, severe facial and body traumas, multiple surgeries, treatment records and studies" the ALJ should have considered "status post trauma, status post surgeries, pain disorder associated to multiple body trauma, ureter and unilateral inguinal hernia and lower back pain as severe impairments." D. 13 at 11. García-Cortés notes that there are references in the record to pain in his legs, hips, lower back, face, neck, and headaches. D. 13 at 10-11. The ALJ, however discussed García-Cortés' medical history of pain. The ALJ noted that García-Cortés reported leg pain, that he had a history of multiple body traumas, "including fractures to his face and right leg, as a result of a motor vehicle accident in 1997," and that García-Cortés had allegations of low back pain. R. 29-30. The ALJ concluded, however, that "[t]here is no other evidence regarding the alleged pain, or any other physical impairment that would justify more than a minimal limitation in [García-Cortés'] ability to perform basic physical work-related activities." R. 31.

García-Cortés argues that the ALJ erroneously relied upon state agency assessments in 2013 and 2014 that did not have the "benefit of any evidence, of treatment nor otherwise, after July 30, 2014." D. 13 at 10. An ALJ, however, may rely upon older assessments  when the information contained in same remains accurate. See Ferland v. Astrue, No. 11–cv–123–SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011) (finding that "an ALJ may rely on such an opinion where the medical evidence postdating the reviewer's assessment does not establish any greater limitations . . . or where the medical reports of claimant's treating providers are arguably consistent

with . . . the reviewer's assessment").  The ALJ noted that the state agency physical assessments in 2013 and 2014 were consistent "with the overall record evidence, as no medical source has recommended a restriction of physical activities or provided a physical functional capacity opinion."  R. 31.  After the state agency assessments, moreover, García-Cortés had a medical appointment with Dr. Díaz Ruíz in April 2016 with unremarkable results.  R. 443.  García-Cortés' upper extremities, back, lower extremities, gastrointestinal, skin, neck respiratory and musculoskeletal were all normal.  R. 443-445.  Dr. Díaz Ruíz noted that García-Cortés was independent in his personal hygiene, able to prepare full meals and that he had a normal physical exam.  R. 444.  These physical findings were also reflected in a June 2016 progress note despite García-Cortés' complaints of low back pain.  R. 441.  Thus, the ALJ's reliance upon the state agency assessments was not improper.

Lastly, García-Cortés notes that the ALJ did not specifically mention that during his April 2016 evaluation he had a pain level of three out of ten, D. 13 at 10-11; see R. 446, that he was prescribed Relafen, a nonsteroidal anti-inflammatory pain relief drug,  D. 13 at 10; see R. 442, and that Dr. Loperena Jimenez noted that he complained of leg, hips and all body pain on the day of the evaluation. D. 13 at 10; see R. 415-419.  García-Cortés does not provide arguments or evidence that these factors caused ongoing limitations greater than those found in his RFC.  Thus, remand is not warranted on these grounds.  See Caterino v. Berryhill, 366 F. Supp. 3d 187, 194-95 (D. Mass. 2019) (affirming the Commissioner's decision because "burden is on the plaintiff to present sufficient evidence of how her alleged impairment limits her functional capacity" and "[she] has proffered no evidence tying . . . her pain . . . to additional limitations . . . beyond those already determined by the ALJ").  For all of the aforementioned reasons, there was  substantial evidence in the record to support the ALJ's findings regarding García-Cortés' physical limitations.

2.    *Mental RFC Findings*

The ALJ concluded that while García-Cortés suffers from major depressive disorder, the "evidence does not support the alleged severity" of his PTSD.  R. 31.  The ALJ discussed Dr. Rodríguez Robles' findings and noted that while García-Cortés had subjective complaints of nightmares, Dr. Rodríguez Robles did not document any related clinical findings.  R. 31.  Dr. Rodríguez Robles' initial diagnostic impression in August 2012, moreover, was "major depressive affective disorder, simple episodes, severe without mention of psychotic behavior."  Id.; see R. 168.

The ALJ also noted García-Cortés' history of medication.  The ALJ discussed that in August 2012, Dr. Rodríguez Robles prescribed García-Cortés Wellbutrin XL and Prosom, which was substituted for Restoril a month later.  R. 31.  Then in October 2012, Dr. Rodríguez added Seroquel to his treatment plan.  Id.  Dr. Rodríguez Robles, however "did not provide an explanation for these changes" in García-Cortés' medication, "did not document any evidence of psychotic features," and "fail[ed] to mention clinical findings consistent with [PTSD], not even the notes that identify [PTSD] as the treating diagnosis."  Id.

Lastly, the ALJ discussed the psychiatric medical report and mental impairment assessment conducted by Dr. Rodríguez Robles in June 2013.  Id.  The ALJ noted again that the report did "not indicate any evidence thought disturbances, perceptual disturbances or clinical findings indicative of [PTSD] or psychosis."  R. 31; see R. 148-153; R. 401-405.  The mental assessment also  did not identify hallucinations, delusions, or recurrent recollections of traumatic experience as a part of García-Cortés' symptoms.  R. 31; see R. 407-411.

García-Cortés contends, however, that the ALJ should have considered his PTSD as a severe impairment given Dr. Rodríguez Robles' notes detailing his symptoms from June 2013 to

April 2014.  D. 13 at 11-12.  First, even assuming García-Cortés' PTSD diagnosis, he has not provided any arguments or evidence on how his alleged PTSD "significantly limit[] [his] [p]hysical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

Second, there is substantial evidence in the record to support the ALJ's conclusion that García-Cortés' PTSD was not a severe impairment "even if the record arguably could justify a different conclusion."  Rodríguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).  Dr. De Paz Ortiz,[5] a psychologist expert opined that a diagnosis of PTSD was not "justified by the record."  R. 59-60.  State psychological consultants Dr. Umpierre and Dr. Soto also assessed García-Cortés and concluded that García-Cortés had only moderate restrictions in daily living, social functioning, maintaining concertation, persistence or pace and no episodes of decompensation.  R. 181; R. 196.  Accordingly, the ALJ did not err in concluding that García-Cortés' PTSD was not a severe impairment.

### B.  The ALJ Did Not Err in Finding That García-Cortés Did Not Meet or Equal Medical Listings 12.15 and 12.04

An impairment "meets" a listing "when it satisfies all of the criteria of that listing."  20 C.F.R. § 416.925(c)(3).  At the time of the ALJ's decision, the B criteria of listings 12.15 and 12.04 required at least two of the following:  (1) "marked restrictions of activities of daily living;" (2) "marked difficulties in maintaining social functioning;" (3) "marked difficulties in maintaining concentration, persistence, or pace;" or (4) "repeated episodes of decompensation, each of

---

[5] García-Cortés also questions the impartiality of Dr. De Paz Ortiz, arguing that her testimony "read more like the testimony of an advocate, or a party, rather than an independent and impartial consultant."  D. 13 at 13.  The Court, however, will not second-guess credibility findings by the ALJ, McNelley v. Colvin, No. 15-cv-1871, 2016 WL 2941714, at *2 (1st Cir. 2016) (noting that credibility determinations by the ALJ are "entitled to deference, especially when supported by specific findings"), where there is substantial evidence in this record, as cited by the ALJ, to support her conclusion as there is in this case.

extended duration." R. 32.[6]  "A marked limitation is more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Id.  The ALJ considered the severity of García-Cortés' mental impairments singly and in combination and found that they did not meet or medically equal the criteria of listing 12.04. Id.  The ALJ did not consider listing 12.15.

García-Cortés argues that the ALJ should have found that his major depressive disorder and PTSD equal or meet the listings of 12.04 and 12.15, respectfully. D. 13 at 13.  As support, he relies upon the August 2012 psychiatric report and Dr. Rodríguez Robles' subsequent progress notes. D. 13 at 14; see R. 168-171.  The ALJ, however, concluded that Dr. Rodríguez Robles' notes were not consistent with his report and that the only information included in the reports are García-Cortés' subjective complaints, as well as notations that he tolerated his prescribed medication. R. 33; see R. 168-171; R. 154-157.  The ALJ concluded that "the objective evidence does not demonstrate significant cognitive limitations to support these [subjective] allegations" and noted that Dr. Rodríguez Robles' notes did not include any clinical observations that demonstrated such significant cognitive limitations. R. 32-33.

---

[6] The Court notes, as a point of clarification, that there is now an updated version of the B criteria which requires extreme limitation of one, or marked limitation of two, functional areas: (1) understanding, remembering or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. pt. 404 subpt. P, App. 1, Part A2, § 12.00(b).  The listings were revised by agency in 2016 and became effective on January 17, 2017, after the ALJ's decision, for any claims that were pending.  Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66139-66140; 66159 (Sept. 26, 2016); see Oski v. Saul, No. 18-cv-30018-MGM, 2020 WL 3722734, at *12 (D. Mass. May 29, 2020).

García-Cortés further argues that his mental disorder is serious and persistent based upon his medical treatments from Dr. Rodríguez Robles and Dr. Caro.  D. 13 at 15-17.  As noted above, these reports and treatments were considered by the ALJ.  The ALJ concluded that García-Cortés only had moderate difficulties.  The ALJ noted that while García-Cortés consistently reported feeling sad and lacking interest in his activities, he was "cooperative during the consultative psychiatric and internal medicine evaluation in November and October 2013," and also "cooperative and interactive during the two documented visits to his general practitioner earlier this year."  R. 33; see R. 415-419; R. 426-427.

The ALJ also considered both Dr. Rodríguez Robles' and Dr. Caro's described limitations in his ability to concentrate and his psychomotor retardation.  R. 33.  The ALJ, however, concluded that García-Cortés "was able to sustain enough attention and concertation to provide the requested information during the consultative psychiatric evaluation and during a contemporaneous consultative internal medicine evaluation" and "did not seem to have any problems with his concentration during two visits to his primary physician earlier this year, or during the last documented visit to his psychiatrist in October 2016."  R. 33; see  R. 441-446; R. 171.  Lastly, the ALJ concluded that the record was devoid of any documented episode of decompensation.  R. 33.

García-Cortés' contention that the ALJ should have come to a different conclusion based upon the record would require this Court to reweigh the evidence.  It is the Commissioner, however, that is tasked with weighing conflicting evidence.  Rodríguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Given all the evidence relied upon by the ALJ, there is substantial evidence supporting the ALJ's finding that García-Cortés has no more than moderate limitations in activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace; or repeated episodes of decompensation.  R. 33.

### C.    The ALJ Did Not Err in Giving Less Weight to Treating and Consulting Psychiatrists

García-Cortés argues that the ALJ erred in giving less weight to treating psychiatrist Dr. Rodríguez Robles and instead relying on the opinion of Dr. De Paz Ortiz. D. 13 at 17-18. García-Cortés further contends that the ALJ erred by arbitrarily discarding portions of consulted psychiatrist Dr. Caro's report. D. 13 at 18. An ALJ may assign controlling weight to the findings of treating physicians if they are "consistent with other substantial evidence in the claimant's record." Guarente v. Berryhill, No. 16-cv-12003, 2017 WL 3621078, at *6 (D. Mass. Aug. 23, 2017) (citing 20 C.F.R. § 416.927(c)(2)). When determining whether controlling weight should be given to a treating source, the ALJ must use a "factors-based test that considers the length of the treatment relationship, nature and extent of the relationship with [the] applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source specializes in the field." Guarente, 2017 WL 3621078 at *6 (citing 20 C.F.R. § 404.1527(c)). The ALJ, however, "need not discuss each factor in his decision on the weight given to a treating physician's opinion if the ALJ provides good reasons supported by substantial evidence in the record." Id.

Here, the ALJ explained why she gave little weight to Dr. Rodríguez Robles' June 2013 psychiatric report. The ALJ noted that the treating physician "did not include any tests or mental status exams in his notes that would account for the limitations mentioned in the Mental Impairment Questionnaire." R. 36. The ALJ, moreover, found that the report was not consistent with the record given that García-Cortés was cooperative, orientated and his speech was fluent, coherent, and logical during his [] interview. R. 33. The ALJ concluded that Dr. Rodríguez Robles "treatment notes are very brief and mostly limited to [García-Cortés'] subjective complaints and the conservative treatment -i.e., medications, which as mentioned (and contrary to the claimant's

allegations) were tolerated well."  R. 35.  The ALJ also noted that Dr. Rodríguez Robles did not refer García-Cortés for psychiatric hospitalization during the relevant period or note any restrictions on activities.  Id.

The ALJ gave Dr. Caro's opinion partial weight "to the extent that he diagnosed [García-Cortés with] a moderate condition with a mild cognitive deficit."  R. 36.  The ALJ, however, found that Dr. Caro's assertion that García-Cortés had a short attention span and impaired concentration was inconsistent with the record for the same reasons discussed above. R. 36. While Dr. Caro noted that García-Cortés had short term memory impairment, moreover, he also noted that his immediate, recent, and remote memory was preserved. R. 36; see R. 427.  Lastly, the ALJ noted that while Dr. Caro diagnosed García-Cortés with major depressive disorder and a pain disorder associated to general medication with a GAF of 50-55, his mini mental status exam score was  23 out of 30, which indicated a mild cognitive impairment. R. 36; see R. 427.

Dr. De Paz Ortiz opined that Dr. Rodríguez Robles' findings were not consistent with the record.  R. 59.   Dr. De Paz Ortiz based her opinion on "the absence of hallucinations, delusions, or other perceptual disturbances that would justify a finding of psychosis" in the record and she "explained that the reported nightmares do not justify the diagnosis of PTSD."  R. 36; see R. 59-60.   Dr. De Paz Ortiz also opined that changes in García-Cortés' medication were not significant. R. 60.

The ALJ gave great weight to Dr. De Paz Ortiz, "who had the benefit of reviewing a complete record" because her opinion was "more consistent with the evidence."  R. 36.  It is well established that giving "substantial weight to the opinions of non-treating medical reviewers," is within the ALJ's discretion.  D.A. v. Colvin, No.11-cv-40216-TSH, 2013 WL 5513952, at *7 (D. Mass. Sept. 30, 2013); (citing Quintana v. Comm'r of Soc. Sec., 110 F. App'x 142, 144 (1st Cir.

2004); <u>DiVirgilio v. Apfel</u>, 21 F. Supp. 2d 76, 81 (D. Mass. Sept. 24, 1998) (holding that an ALJ may assign greater reliance on the findings of non-treating physicians if they have reviewed the medical evidence available).

The ALJ explained that he gave greater weight to Dr. De Paz Ortiz's opinion because "she is familiar with SSA policy and regulations," "she reviewed the complete documentary record, including the most recent evidence," "she is a specialist in the field of mental health and provided a detailed explanation with references to the evidence in the record to support her opinion," and because her "opinion is also generally consistent with the State agency mental assessments." R. 37; <u>see</u> R. 32. The ALJ provided a "rational explanation" for assigning greater weight to the opinions of Dr. De Paz, and thus the Court concludes that the ALJ did not err in relying upon her assessment. <u>See</u> <u>D.A.</u>, 2013 WL 5513952 at *8. As a result, and contrary to García-Cortés' contention otherwise, D. 13 at 17, the hypotheticals that the ALJ posed to the VE focused upon the appropriate limitations.

## VII. Conclusion

For the foregoing reasons, the Court DENIES García-Cortés' motion to reverse and remand, D. 13, and ALLOWS the Commissioner's motion to affirm, D. 16.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge